IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| VICKI A. SEARLE,<br><br>  Plaintiff,<br><br><br><br>  vs.<br><br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>  Defendant. | MEMORANDUM DECISION AND ORDER ON ADMINISTRATIVE APPEAL<br><br><br><br><br><br>Case No. 2:09-CV-267 TS |

This matter comes before the Court on Plaintiff Vicki A. Searle's appeal from the decision of the Social Security Administration denying her application for disability insurance benefits and supplemental security income.  Having considered the arguments set forth by the parties, reviewed the factual record, relevant case law, and being otherwise fully informed, the Court will affirm the administrative ruling, as discussed below.

## I.  STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited to determining whether its findings are supported by substantial evidence and whether the correct legal standards were applied.[1]

---

[1] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  The ALJ is required to consider all of the evidence, although he or she is not required to discuss all of the evidence.[3]  If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[4]

The Court should evaluate the record as a whole, including that evidence before the ALJ that detracts from the weight of the ALJ's decision.[5]  However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the ALJ's.[6]

Plaintiff raises three arguments in her brief: (1) the ALJ erred in failing to properly evaluate the opinions of Plaintiff's treating physician; (2) the ALJ erred by failing to properly evaluate Plaintiff's mental impairments; and (3) the ALJ erred by failing to articulate an RFC that included all of Plaintiff's limitations.

## II.  BACKGROUND

A.   PROCEDURAL HISTORY

Plaintiff initially applied for benefits on September 29, 2005, alleging a disability onset date of December 31, 1998.[7]  Plaintiff's claim was initially denied on May 15, 2006,[8] and upon

---

[2]*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

[3]*Id*.

[4]*Richardson v. Perales*, 402 U.S. 389, 402 (1981).

[5]*Shepard v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[6]*Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

[7]R. at 57-59.

[8]*Id*. at 48-50.

reconsideration on November 16, 2006.[9]  Plaintiff requested a hearing before an administrative

law judge ("ALJ").[10]  A hearing was held on December 13, 2007, at which Plaintiff failed to

appear.[11]  Plaintiff's counsel did appear at that hearing and amended the alleged onset date to

September 29, 2005.[12]  The ALJ heard from Plaintiff's counsel and a vocational expert at the first

hearing.[13]  A second hearing was held on March 10, 2008, and again Plaintiff failed to appear.[14]

Plaintiff did appear at a third hearing held on May 16, 2008.[15]  The ALJ issued a decision on

June 18, 2008, finding that Plaintiff was not disabled.[16]  The Appeals Council denied Plaintiff's

request for review on February 26, 2009.[17]  Plaintiff then filed the instant action.

B.      MEDICAL HISTORY

        In April 2004, Plaintiff was seen by R. Thomas Bonk, M.D., for knee, hip, and back

pain.[18]  X-rays showed a small joint effusion in her right knee, but no abnormalities in her left

knee or hip.[19]  As to her back, Dr. Bonk found degenerative disk disease at L4-5 and mild

---

[9]*Id*. at 44-46.

[10]*Id*. at 50.

[11]*Id*. at 509-527.

[12]*Id*. at 512.

[13]*Id*. at 509-527.

[14]*Id*. at 528-31.

[15]*Id*. at 532-71.

[16]*Id*. at 17-35.

[17]*Id*. at 5-7.

[18]*Id*. at 164, 333-34.

[19]*Id*. at 163-64, 333-35.

anterior wedge compression of L1.[20]  In June 2004, Plaintiff was diagnosed with lower back muscle spasms, and was directed not to lift more than 15 pounds repeatedly and not more than 25 pounds at any one time.[21]

On July 22, 2004, Yvonne McCall, PA-C, MS, wrote that Plaintiff had been a patient of the Fourth Street Clinic since April 2003.[22]  Ms. McCall noted that Plaintiff had been diagnosed with several conditions, the most debilitating of which had been hypertension.[23]

On September 28, 2005, Plaintiff presented to the Fourth Street Clinic complaining of pain in her back and joints.[24]  The medical provider observed multiple trigger points on Plaintiff's back, neck, and extremities.[25]  Plaintiff was assessed with fibromyalgia and was prescribed medication.[26]  During a follow-up visit in October 2005, Plaintiff indicated that she was feeling better but still had muscle aches.[27]

Plaintiff was seen by Richard J. Ingebretsen, M.D., on November 30, 2005.[28]  Plaintiff complained of fibromyalgia, noting that she had pain in her spine and her joints.[29]  Plaintiff

---

[20]*Id.* at 163, 336.

[21]*Id.* at 180.

[22]*Id.* at 314.

[23]*Id.*

[24]*Id.* at 301.

[25]*Id.*

[26]*Id.*

[27]*Id.* at 299.

[28]*Id.* at 210.

[29]*Id.*

indicated that she could walk for many blocks, lift no more than 20 pounds, stand for 30 minutes and sit for one hour.[30]  In a subjective review of Plaintiff's upper extremity function, Dr. Ingebretsen noted that Plaintiff could: use her back pockets, wash the opposite underarm, eat with utensils, comb her hair, dress and undress using both her upper and lower extremities, and use her hands overhead.[31]  In a subjective review of Plaintiff's general function, Dr. Ingebretsen noted that Plaintiff could: walk up stairs, walk 1/2 mile with pain, lift 20 pounds, sit for one hour, stand for 30 minutes, drive a car, perform light house work, and cook.[32]  Upon physical examination, Dr. Ingebretsen noted no cervical, thoracic, or lumbar tenderness.[33]  Dr. Ingebretsen noted that there was no joint swelling of the hand or knee joints and that Plaintiff had no joint tenderness.[34]  Plaintiff was found to have normal range of motion and muscle strength in both her upper and lower extremities.[35]  Dr. Ingebretsen assessed Plaintiff with "back pain - fibromyalgia."[36]  He noted:

> The patient has pain in her joints, muscles and spine.  On examination she moved carefully to protect her back but not to a great extent.  She had some difficulty with heel and toe walking.  She was able to walk without pain and without a cane.  She had trouble hoping [sic] on either foot.  Her biggest complaint is that of back pain where she had a full [range of motion] with moderate pain.  She had a weakly positive straight leg test today on the right.  She could stoop to about 50%

---

[30]*Id.*

[31]*Id.*

[32]*Id.* at 211.

[33]*Id.*

[34]*Id.*

[35]*Id.* at 212.

[36]*Id.*

of normal.  She had the complaint of muscle pain as well when moving.  She carried a bunch of papers and was able to open and carry a purse and walk while holding the hand of her son today.[37]

In January 2006, Elizabeth Allen, Ph.D., conducted a psychological examination of Plaintiff.[38]  Dr. Allen noted that Plaintiff was cooperative throughout the examination and that her state of consciousness was cognizant and clear.[39]  Plaintiff was oriented as to time, place, and person, and her general knowledge was average.[40]  Plaintiff's abilities to concentrate and attend were in the average range, as was her remote and recent memory, though her immediate memory was below average.[41]  As to her daily activities, Dr. Allen noted that Plaintiff was able to use public transportation, complete housekeeping chores, go to the movies with her son, and be responsible for money management.[42]  Dr. Allen diagnosed Plaintiff with dysthymic disorder, depressive disorder due to fibromyalgia, and alcohol abuse sustained partial remission.[43]  Dr. Allen assessed Plaintiff's Global Assessment of Functioning ("GAF") as 55-65, indicating mild to moderate symptoms.[44]

---

[37]*Id.*

[38]*Id.* at 213-17.

[39]*Id.* at 215.

[40]*Id.*

[41]*Id.* at 215-16.

[42]*Id.* at 216.

[43]*Id.* at 217.

[44]*Id.*

Plaintiff was hospitalized on January 23, 2006, due to abdominal pain caused by pancreatitis.[45]  Plaintiff indicated that she had a history of alcoholism, but had been away from alcohol for 10 to 12 years.[46]  Plaintiff remained hospitalized for eight days.[47]  At her discharge, Plaintiff was diagnosed with pancreatitis, right upper extremity swelling, hypertension, and gastroesophageal reflux disease.[48]  In February 2006, Plaintiff underwent surgery to remove a stone from the pancreatic duct.[49]  Since then, Plaintiff has been hospitalized on two other occasions for pancreatitis.[50]

In April 2006, a state agency physician, Dr. Burkett, assessed Plaintiff's physical residual functional capacity.[51]  Dr. Burkett found that plaintiff could: occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb a ladder, rope, or scaffolding.[52]  Dr. Burkett found no manipulative, visual, communicative, or environmental limitations.[53]

---

[45]*Id*. at 235.

[46]*Id*.

[47]*Id*. at 218.

[48]*Id*.

[49]*Id*. at 238.

[50]*Id*. at 448-64, 484-508.

[51]*Id*. at 250-57.

[52]*Id*. at 251-52.

[53]*Id*. at 253-54.

In May 2006, a state agency psychiatric consultant, John Hardy, completed a Psychiatric Review Technique form.[54] Mr. Hardy found that Plaintiff had a medically determinable impairment—dysthymic disorder—but that it did not satisfy the diagnostic criteria for affective disorders found in Listing 12.04.[55] As to Plaintiff's functional limitations, Mr. Hardy found: no restrictions of activities of daily living; insufficient evidence relating to maintaining social functioning; mild limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation.[56] Finally, Mr. Hardy found that the evidence did not establish the presence of the part C criteria of Listing 12.04.[57]

Plaintiff completed a questionnaire for a therapist, Larry Beall, Ph.D.[58] Dr. Beall then reported that Plaintiff's anxiety was extreme and that her depression was in the moderate to severe range.[59] Dr. Beall reported that, as to Plaintiff's daily activities, she goes to a lot of appointments and she lies in bed watching videos to get her mind off the pain.[60] Dr. Beall reported that Plaintiff was lethargic, did not want to do anything, and avoided contact with others.[61] Dr. Beall diagnosed Plaintiff with generalized anxiety disorder and major depression,

---

[54]*Id*. at 258-71.

[55]*Id*. at 261.

[56]*Id*. at 268.

[57]*Id*. at 269.

[58]*Id*. at 277-81.

[59]*Id*. at 282.

[60]*Id*. at 283.

[61]*Id*.

recurrent, moderate.[62]  Dr. Beall also assigned a GAF score of 48, indicative of serious

symptoms.[63]

      In July 2006, Plaintiff was examined by Christopher Mendoza, M.D.[64]  Plaintiff reported

that she walked quite a bit because she had no car and was able to swim once or twice per day.[65]

Dr. Mendoza assessed low back pain with radicular symptoms, lower lumbar degenerative

changes, and leg pain.[66]  Dr. Mendoza performed an EMG on August 4, 2006, which showed L5-

S1 radiculopathy with ongoing denervation and disk bulges at L4-5 and L5-S1.[67]  Dr. Mendoza

administered a steroid injection on August 16, 2006.[68]

      In December 2006, Dr. Beall completed a Mental Impairment Questionnaire.[69]  On that

Questionnaire, Dr. Beall noted that he had been treating Plaintiff weekly for approximately two

years.  Dr. Beall noted a diagnosis of posttraumatic stress disorder and major depressive disorder,

recurrent, moderate to severe, and assessed a GAF score of 48.[70]  Dr. Beall marked a number of

boxes identifying Plaintiff's signs and symptoms.[71]  Dr. Beall noted: marked restrictions of

---

[62]*Id.*

[63]*Id.*

[64]*Id.* at 289.

[65]*Id.*

[66]*Id.*

[67]*Id.* at 286.

[68]*Id.* at 284.

[69]*Id.* at 398-401.

[70]*Id.* at 398.

[71]*Id.* at 399.

activities of daily living; marked restrictions in maintaining social functioning; extreme deficiencies of concentration, persistence, or pace; and four or more repeated episodes of decompensation, each of extended duration.[72]  Dr. Beall also indicated that Plaintiff would be absent from work more than four days per month.[73]

Dr. Beall also completed a Mental Residual Functional Capacity Assessment.[74]  Dr. Beall opined that Plaintiff had extreme limitations in her ability to: maintain sufficient attention and concentration to appropriately complete tasks in a timely manner; perform at a consistent pace without an unreasonable number and length of rest periods; complete a normal workday without interruptions from psychologically based symptoms; understand, remember, and carry out detailed instructions; maintain attention/concentration for extended periods and complete tasks independently, effectively, and in a timely manner; and deal with stress of semiskilled and skilled work.[75]  Dr. Beall opined that Plaintiff had marked limitations in her ability to: remember work-like procedures; meet quality and accuracy standards; respond appropriately to changes in a routine work setting; deal with normal work stress; travel in unfamiliar places; and perform a few routine tasks over and over with little opportunity for diversion or interruption.  Dr. Beall stated that Plaintiff had mild to moderate limitations in her ability to: complete tasks without extra supervision or assistance and work in coordination with or proximity to others without being

---

[72]*Id*. at 400.

[73]*Id*. at 401.

[74]*Id*. at 402-04.

[75]*Id*. at 402-04.

unduly distracted.[76]  Dr. Beall stated that Plaintiff had either mild or moderate limitations in her

ability to: understand, remember, and carry out very short and simply instructions; make simple

work-related decisions; accept instructions and respond appropriately to criticism from

supervisors; get along with co-workers or peers without unduly distracting them or exhibiting

behavioral extremes; be aware of normal hazards and take appropriate precautions; set realistic

goals or make plans independently of others; interact appropriately with the general public;

perform tasks only under specific instructions, allowing little or no room for independent action

or judgment in working out problems; and deal with people in work situations beyond receiving

work instructions.[77]  Dr. Beall also stated that Plaintiff could maintain benefits in her own best

interest.[78]

   In January 2007, Dr. Beall wrote to the Division of Rehabilitation Services indicating that

Plaintiff would benefit from that agency's services to help her obtain work.[79]  In February 2007,

Dr. Beall diagnosed Plaintiff with: posttraumatic stress disorder; generalized anxiety disorder;

major depression, recurrent, moderate to severe; and obsessive compulsive disorder.[80]  Dr. Beall

assessed Plaintiff with a GAF score of 50.[81]

---

[76]*Id*. at 402-04.

[77]*Id*. at 402-04.

[78]*Id*. at 404.

[79]*Id*. at 397.

[80]*Id*. at 395.

[81]*Id*. at 396.

In March 2007, Plaintiff was seen again by Dr. Mendoza.[82]  Dr. Mendoza made the following diagnoses: left L5-S1 radiculopathy; low back pain with L4-5 and L5-S1 degenerative disk bulges and facet arthropathy; bilateral shoulder impingement, right greater than left, with marked glenohumeral degenerative arthritis on the right side; bilateral knee pain with patellofemoral syndrome and patellar tilt and mild lateral patellar subluxation.[83]  Dr. Mendoza injected Plaintiff's right knee with cortisone which immediately resolved the achiness.[84]  Dr. Mendoza also injected the right shoulder which immediately improved the ache and burn.[85]  A few days later, Dr. Mendoza also performed an epidural cortisone injection in Plaintiff's back, which resulted in a large reduction in pain.[86]

Plaintiff was admitted to the University of Utah Neuropsychiatric Institute in October 2007, for delusional thought content, relapse on alcohol, statements of suicidal ideation, and an inability to function outside of a hospital setting.[87]  Upon discharge, Plaintiff was diagnosed with: bipolar disorder, alcohol abuse, and history of alcohol dependence.[88]  At that time, Plaintiff was assigned a GAF score of 50.[89]

---

[82]*Id*. at 377-84.

[83]*Id*. at 378.

[84]*Id*. at 379.

[85]*Id*.

[86]*Id*. at 377.

[87]*Id*. at 423.

[88]*Id*. at 421-22.

[89]*Id*. at 422.

C.      HEARING TESTIMONY

At the May 16, 2008 hearing, the ALJ received testimony from Plaintiff and from a vocational expert.  Plaintiff testified that she had trouble with her memory with her prior work and would get sick and not be able to go into work.[90]  Plaintiff also testified that she could not sit, stand, or lie down for extended periods because of her back.[91]  She stated that, as of the alleged onset date, she could sit for 30 to 45 minutes, stand for 30 to 45 minutes, and lift 10 pounds.[92]  At the time of the hearing, Plaintiff could sit for 30 minutes, stand for 30 to 45 minutes, walk for about an hour, and lift 10 to 15 pounds.[93]  Plaintiff testified that she was able to go grocery shopping.[94]

Turning to her mental limitations, Plaintiff testified that she gets really "stressed out" and that the stress leads to anxiety attacks.[95]  Plaintiff testified that it was both her physical and mental impairments which prevented her from working.[96]

---

[90]*Id*. at 537-39.

[91]*Id*. at 539.

[92]*Id*. at 539-41.

[93]*Id*. at 547-48.

[94]*Id*. at 548.

[95]*Id*. at 550.

[96]*Id*. at 551.

Concerning her alcohol use, Plaintiff stated that she had been off and on alcohol for the 12 years prior to 2007, and had been completely off alcohol for the 5 years prior to 2007.[97] Plaintiff suffered a lapse of alcohol use in 2007, which resulted in hospitalization.[98]

The ALJ then heard testimony from a vocational expert. The vocational expert identified Plaintiff's past work as a "social worker, psychiatric," a skilled, sedentary occupation.[99] The ALJ then set out the following residual functional capacity:

> Light, unskilled, but a limited range both physically and mentally. The light job could allow for being on their feet up to six hours in an eight hour day, but could only involve sedentary lifting. They could be seated for six hours and . . . be on the feet for six hours, but would also require a 30 minute sit, stand option. That means they would have to have the option every 30 minutes to make a brief postural change, but they could still log the total hours. The work could not involve any bending, stooping, twisting or squatting [of] any significance. It could not involve any work on the floor. Essentially no kneeling, crawling or crouching. It could not involve stair climbing. A few steps would be okay, but no flights of stairs could be climbed. On the non-exertional side of the residual functional capacity the work would have to be at the lower stress level. Low stress means . . . a low production job where jobs are classified as low, average or high production. We want the low or third part there. Essentially no working with the general public. Only minimal contact with supervisors and co-workers on the job, but still having the ability to respond appropriately to supervision, co-workers and work situations. And lastly, the ability to deal with only minimal changes in a routine work setting. . . .[100]

While this ruled out Plaintiff's previous work, the vocational expert identified jobs in the national economy that such a person could perform.[101]

---

[97]*Id*. at 543.

[98]*Id*. at 543-44.

[99]*Id*. at 563.

[100]*Id*. at 563-65.

[101]*Id*. at 565.

D.      THE ALJ'S DECISION

The ALJ issued his decision on June 18, 2008.  The ALJ first dismissed Plaintiff's claims

for disability insurance benefits.[102]  The ALJ found that Plaintiff had not engaged in substantial

gainful activity since the amended alleged onset date.[103]  The ALJ found that Plaintiff had the

following severe impairments: degenerative disc disease of the lumbar and cervical spine;

degenerative joint disease of the shoulders; chronic pancreatitis; hypertension; gastroesophageal

reflux disease; fibromyalgia; affective disorder; generalized anxiety disorder; and posttraumatic

stress disorder.[104]  The ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or equaled a listed impairment.[105]  The ALJ found that Plaintiff had the

ability to perform light, unskilled work, with the limitations given to the vocational expert at the

hearing.[106]  The ALJ determined that Plaintiff could not perform her past relevant work,[107] but

could perform jobs that exist in significant numbers in the national economy.[108]  Therefore, the

ALJ found that Plaintiff was not disabled.[109]

---

[102]R. at 20.  This decision has not been challenged by Plaintiff.

[103]*Id*.  The ALJ incorrectly refers to the amended alleged onset date as August 29, 2005,
when it is actually September 29, 2005.  *See id*. at 57, 512.  This error does not change the
Court's analysis.

[104]*Id*. at 20.

[105]*Id*. at 20-23.

[106]*Id*. at 24.

[107]*Id*. at 33.

[108]*Id*. at 34.

[109]*Id*. at 35.

III.  DISCUSSION

Plaintiff raises the following arguments in her brief: (1) the ALJ failed to properly weigh medical opinion evidence; (2) the ALJ improperly evaluated Plaintiff's credibility; (3) the ALJ's findings that Plaintiff can perform light work and that she had no restrictions in the use of the upper extremities are not supported by substantial evidence and were not made in accordance with legal standards; and (4) the ALJ's findings regarding Plaintiff's mental residual functional capacity are not supported by substantial evidence and were not made in accordance with legal standards.

A.     MEDICAL OPINION EVIDENCE

Plaintiff first argues that the ALJ failed to properly weigh the evidence from her treating therapist, Dr. Beall.  The ALJ stated as follows:

> The Administrative Law Judge does not give Dr. Beall's opinion controlling weight because it is not well supported.  As discussed in greater detail below, his diagnoses have changed within a very short period of time.  Further, his opinion is inconsistent with other substantial evidence.  For example, a year before in January 2006, Dr. Allen diagnosed dysthymia and rule[d] out major depressive disorder and assigned a GAF score of 55-65, indicating mild to moderate symptoms.  In addition, his opinion is internally inconsistent.  For example, he indicates she has symptoms of bipolar disorder and anxiety, but has not diagnosed these conditions.  In contrast, on January 25, 2007, he indicates the claimant has anxiety, panic disorder and depression, but makes no reference to post traumatic stress disorder.  On February 26, 2007, he diagnosed PTSD, generalized anxiety disorder, major depression, recurrent, moderate to severe, and obsessive compulsive disorder, but still makes no reference to bipolar disorder.  Similarly, his assessment contradicts his other statements.  For example, his assessment of the claimant's ability to function under the "B" and "C" criteria indicate the claimant is barely able to function.  However, a few weeks later on January 25, 2007, he indicates the claimant would benefit from rehabilitation services pursuant to her obtaining work.  Dr. Beall's opinion admits an interface of fibromyalgia and depression, and it is unclear whether his opinion does not include the effects of a physical disorder in his limitations.  Although Dr. Beall indicates he has . . . seen the claimant weekly for about two years, there are no

progress notes in the record to support this claim.  Thus, the undersigned gives Dr. Beall's opinion little weight.[110]

Later in the opinion the ALJ stated:

The Administrative Law Judge does not give Dr. Beall's opinion controlling weight because it is not well supported.  Although he first saw the claimant in June 2006, there are no records of treatment.  As discussed in greater detail above, his diagnoses have changed within a very short period of time.  Similarly, his assessment contradicts his other statements.  For example, his assessment of the claimant's ability to function indicates the claimant is barely able to function.  However, a few weeks later on January 25, 2007, he indicates the claimant would benefit from rehabilitation services pursuant to her obtaining work.  Taken together with other criticisms of Dr. Beall's opinions state above, the undersigned gives Dr. Beall's opinion little weight.[111]

The ALJ, in reviewing the opinions of treating sources, must engage in a sequential analysis.[112]  First, the ALJ must consider whether the opinion is well-supported by medically acceptable clinical and laboratory techniques.[113]  If the ALJ finds that the opinion is well-supported, then he must confirm that the opinion is consistent with other substantial evidence in the record.[114]  If these conditions are not met, the treating physician's opinion is not entitled to controlling weight.[115]

---

[110]*Id*. at 22-23 (citations omitted).

[111]*Id*. at 33 (citations omitted).

[112]*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

[113]*Id*.

[114]*Id*.

[115]*Id*.

This does not end the analysis, however.  Even if a physician's opinion is not entitled to controlling weight, that opinion must still be evaluated using certain factors.[116]  Those factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[117]

After considering these factors, the ALJ must give good reasons for the weight he ultimately assigns the opinion.[118]  If the ALJ rejects the opinion completely, he must give specific, legitimate reasons for doing so.[119]

The Court finds that the ALJ applied the correct legal standard to the evaluation of Dr. Beall's opinions.  First, the ALJ considered whether Dr. Beall's opinions were well-supported by medically acceptable clinical and laboratory techniques.  The ALJ concluded that they were not, specifically citing to a lack of treatment records for the two years that Dr. Beall had treated Plaintiff.  Having concluded that Dr. Beall's statements were not well-supported, the ALJ properly found that they were not entitled to controlling weight.  The ALJ then considered the factors set forth above and gave good reasons for the weight he ultimately gave to Dr. Beall's opinions.  Specifically, the ALJ cited to the fact that Dr. Beall's diagnoses had changed within a

---

[116]*Id.*

[117]*Id.* at 1301 (quoting *Drapeau v. Massanri*, 255 F.3d 1211, 1213 (10th Cir. 2001)).

[118]*Id.*

[119]*Id.*

18

very short period of time and that his assessment of extreme limitations contradicts his other statements as reasons for giving Dr. Beall's opinions little weight.  Based on this, the Court finds that the ALJ applied the proper legal standard to the consideration of the opinions of Dr. Beall.

B.    CREDIBILITY

Plaintiff next argues that the ALJ failed to properly evaluate her credibility.  Specifically, Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence. "Credibility determinations are peculiarly the province of the finder of fact, and [the reviewing court] will not upset such determinations when supported by substantial evidence."[120]  However, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[121]

As to Plaintiff's credibility, the ALJ concluded: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."[122]  The ALJ based this determination on what he viewed were a number of supposed contradictions in the record, including that: (1) Plaintiff considered herself disabled for a number of years before she sought benefits; (2) Dr. Beall wrote a letter in January 2007 seeking to obtain services for Plaintiff from the Division of Rehabilitation Services; (3) she was able to work after two head injuries; (4) an examination by Dr. Ingebretsen found no cervical, thoracic or lumbar

---

[120]*Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation marks and citation omitted).

[121]*Id.* (alternation omitted).

[122]R. at 31.

tenderness, full range of motion with only moderate pain, a weakly positive straight leg test on

the right, and noted that Plaintiff had the ability to carry a purse and walk while holding her son's

hand; (5) Plaintiff exhibited a positive response to treatment; (6) Plaintiff's failure to follow up

with treatment; (7) Plaintiff's inconsistent statements concerning her alcohol use; (8) Plaintiff's

statement that when she takes her medications she is okay; (9) Plaintiff's pancreatitis appears to

be caused by poor diet rather than alcohol abuse; and (10) Plaintiff made inconsistent statements

concerning swimming.[123]

     Plaintiff argues that these factors do not support the ALJ's finding that Plaintiff's

statements concerning the intensity, persistence, and limiting effects of her symptoms were not

entirely credible.  The Court agrees that some of these factors do not support the ALJ's finding of

a lack of credibility.  For example, it is unclear how the cause of Plaintiff's pancreatitis bears on

her credibility at all.  Further, the ALJ's determination that Plaintiff made inconsistent statements

concerning her alcohol use appears to be inconsistent with the record.  While the ALJ perceived

Plaintiff's testimony to be that she was *completely* off alcohol for 12 years prior to 2006, her

testimony was that in November 2007 she had been completely off alcohol for 5 years, and had

been on and off alcohol for the 12 years prior.[124]

     Despite certain failings, many of the reasons the ALJ cited as a reason for discounting

Plaintiff's credibility are legitimate and are supported by substantial evidence in the record.  Dr.

Ingebretsen's 2005 examination of Plaintiff is a good example.  As set forth above, in that

examination Dr. Ingebretsen found: no cervical, thoracic, or lumbar tenderness; no joint swelling

---

[123]*Id*. at 30-31.

[124]*Id*. at 543.

of the hand or knee joints and no joint tenderness; and that Plaintiff had normal range of motion and muscle strength in both her upper and lower extremities.[125]  Dr. Ingebretsen's findings clearly conflict with Plaintiff's statements of extreme limitation and are supported by the record. Based on these things, the Court, recognizing that credibility determinations are peculiarly the province of the finder of fact, will not disturb the ALJ's finding as to Plaintiff's credibility.

C.     PHYSICAL RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next challenges the ALJ's findings concerning her physical residual functional capacity.  Specifically, Plaintiff argues that the ALJ should have found her knee impairment to be severe, that the ALJ erred in his determination of Plaintiff's abilities to use her upper extremities, and that the ALJ erred in his determination that Plaintiff could stand for 6 hours in an 8-hour day.

As noted above, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and cervical spine; degenerative joint disease of the shoulders; chronic pancreatitis; hypertension; gastroesophageal reflux disease; fibromyalgia; affective disorder; generalized anxiety disorder; and posttraumatic stress disorder.[126]  Absent from this list is Plaintiff's knee impairment.  Plaintiff argues that the ALJ should have found that impairment to be severe.

There is little evidence concerning Plaintiff's knee impairment.  In March 2007, Dr. Mendoza diagnosed Plaintiff with bilateral knee pain with patellofemoral syndrome and patellar

---

[125]*Id*. at 211-12.

[126]*Id*. at 20.

tilt and mild lateral patellar subluxation.[127]  Dr. Mendoza injected Plaintiff's right knee with cortisone which immediately resolved the achiness.[128]  Plaintiff did not follow up with Dr. Mendoza[129] and there is no other evidence supporting a finding that her knee impairment was severe.  Therefore, the Court cannot find that the ALJ erred in this respect.

Plaintiff next argues that the ALJ erred in his determination concerning Plaintiff's use of her upper extremities.  The ALJ found that Plaintiff had the ability to perform light work, with some limitations, including that said work could not require: lifting more than 10 pounds at a time or lifting and carrying lighter articles on an occasional basis.[130]  The ALJ noted no other restrictions concerning Plaintiff's upper extremities.

As noted, Dr. Mendoza diagnosed Plaintiff with bilateral shoulder impingement, right greater than left, with marked glenohumeral degenerative arthritis on the right side.[131]  Dr. Mendoza injected the right shoulder which immediately improved the ache and burn.[132]  Dr. Ingebretsen found that Plaintiff had normal range of motion and muscle strength in her upper extremities.[133]  Dr. Burkett found that evidence of manipulative limitations—reaching, handling, fingering, or feeling—was not established.[134]  Based on this evidence, the Court finds that the

---

[127]*Id.* at 378.

[128]*Id.* at 379.

[129]*Id.* at 376.

[130]*Id.* at 24.

[131]*Id.* at 378.

[132]*Id.* at 379.

[133]*Id.* at 212.

[134]*Id.* at 253.

ALJ's refusal to find other limitations concerning the use of Plaintiff's upper extremities is supported by substantial evidence.

Plaintiff's final challenge to the ALJ's physical residual functional capacity assessment is his finding that Plaintiff could stand for 6 hours in an 8-hour day.  This too is supported by substantial evidence.  For instance, Dr. Burkett found that Plaintiff could stand and/or walk for six hours in an eight-hour workday.[135]

Based on the above, the Court finds that the ALJ's determination of Plaintiff's physical residual functional capacity is supported by substantial evidence.

D.      MENTAL RESIDUAL FUNCTIONAL CAPACITY

Finally, Plaintiff challenges the ALJ's determination of her mental residual functional capacity.  Plaintiff argues that the ALJ's mental residual functional capacity assessment conflicts with Dr. Beall's opinions.  Plaintiff also argues that the same ALJ has made the same or similar mental residual functional capacity assessment in a number of cases where the claimants have had differing mental impairments.

The ALJ placed the following limitations on Plaintiff: (1) she could not work at more than a low stress level; (2) she could not work at more than a low concentration level; and (3) she could not work at more than a low memory level.[136]

The Court turns first to Plaintiff's argument that the ALJ's assessment differed from that of Dr. Beall.  This is essentially the same argument raised above.  As stated above, the ALJ used the proper legal standard when evaluating the opinions of Dr. Beall and his decision to not give

---

[135]*Id*. at 251.

[136]*Id*. at 24.

those opinions controlling weight is supported by substantial evidence.  The Court rejects Plaintiff's argument here on the same grounds.

Plaintiff also argues that the same ALJ has made the same or similar mental residual functional capacity assessment in a number of cases where the claimants have had differing mental impairments.  As a result, Plaintiff argues that the ALJ has failed to consider her case individually.  Plaintiff has provided 11 decisions from the same ALJ to support her argument. Defendant argues that the Court should not consider this evidence and that even if the Court were to consider the evidence it does not warrant a reversal of the ALJ's decision.

Defendant is correct that "[t]he Social Security Act generally precludes consideration on review of evidence outside the record before the Secretary."[137]  The Court may, however, remand for consideration of new evidence where such evidence is material and the claimant demonstrates good cause for failing to submit the new evidence at the administrative level.[138]  Plaintiff has not made such a showing.  Therefore, the Court finds that the evidence submitted by Plaintiff should not be considered and does not warrant a remand.

Even if the Court were to consider this outside evidence, the Court finds that it does not warrant reversal.  The Court is concerned by Plaintiff's argument that a number of different claimants have been assessed the same or a similar mental residual functional capacity by the same ALJ.  However, upon closer examination of the decisions provided by Plaintiff, the Court's concerns are allayed.  A review of those decisions reveals that the mental impairments of each of

---

[137]*Delrosa v. Sullivan*, 922 F.2d 480, 483 (8th Cir. 1991); *see also* 42 U.S.C. § 405(g) (sentence four) ("The court shall have power to enter, *upon the pleadings and transcript of the record*, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.") (emphasis added).

[138]42 U.S.C. § 405(g) (sentence six).

these claimants is not as different as Plaintiff suggests.  Indeed, the ALJ considered Listing 12.04

for Affective Disorders for each of these claimants, including Plaintiff.  The ALJ also considered

Listing 12.06 for Anxiety Related Disorders for many.  Thus, each of these claimants had similar

mental impairments and it seems appropriate that each was assessed a similar mental residual

functional capacity.  Further, there are differences between the residual functional capacity

assessments, which shows that the ALJ did in fact conduct an individualized analysis with each

claimant.

The real issue before the Court is whether or not the ALJ's determination of Plaintiff's

mental residual functional capacity here is supported by substantial evidence.  The Court finds

that it is.  In particular, the ALJ's assessment is supported by the reports of Dr. Allen[139] and Mr.

Hardy.[140]  The residual functional capacity assessment is also supported by Plaintiff's testimony

concerning her problems with memory[141] and stress.[142]  Based on this, the Court finds that the

ALJ's residual functional capacity assessment is supported by substantial evidence.

## IV.  CONCLUSION

Having made a thorough review of the entire record, the Court finds that the ALJ's

evaluation and ruling is supported by substantial evidence.  Therefore, the Commissioner's

findings must be affirmed.  Further, the Court finds that the ALJ applied the correct legal

standard in determining that Plaintiff did not have a disability.

---

[139]*Id*. at 213-17.

[140]*Id*. at 258-71.

[141]*Id*. at 537-39.

[142]*Id*. at 550.

For the reasons just stated, the Court hereby AFFIRMS the decision below.  The hearing set for February 4, 2010, is STRICKEN.  The Clerk of the Court is directed to close this case forthwith.

DATED   January 12, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge